Your Honor, Larry Williams and Jim Bozeman for the appellant Gary Conti. May I please reserve four minutes? The case involves, as you know, a case of federal grant fraud and a case of bankruptcy fraud tried in two separate trials. I'd like to address the grant fraud allegations first. On the issue of materiality, the government's entire case is based on a premise that simply can't be found in the record, and that is that the filing of the in-kind reports, that is, the in-kind contributions of the Blackfeet Tribe to this particular grant, were instrumental, that is, they were required to continue funding. That simply isn't so. And before we go any further, this is a case of grant fraud where the grant itself is not in evidence. The government claims, and that's important because the government claims that the in-kind summaries were material to the fraud allegations in counts 1 through 28. If there's no materiality, which is an element of the crime, the inquiry ends there. The government's transcript sites in their brief to support that allegation are interesting for these claims that in-kind reporting was material because it caused the funding of the grant to continue. When you look at the couple pages cited, the testimony of Mr. Spears, the gentleman from Washington, on direct examination says the audits were conducted after all the money had been sent. So I have a question for you about that. I understand the argument you put a lot of stress on that the misrepresentations in connection with the audits is after the horse is out of the barn or all the money's gone. But also, as I understood the government's papers, they've argued that there were misrepresentations in terms of in-kind summaries that were submitted in part before the money was all doled out. Perhaps you could address that as part of your argument. Yes, sir. The in-kind summaries, actually, there were three types of in-kind. There were invoices from individual vendors. There were in-kind summaries, which were monthly, and the year-end reports. The key part of my argument is that no matter what in-kind elements are involved in this case, first, Gary Conte himself wasn't involved or didn't aid or abet any falsification of anything. Second, of the various in-kind submissions to the government, there is nothing in the record either from the Code of Federal Regulations or from the grant itself because we don't know what the grant says because it's not in evidence that makes those the linchpin for funding this grant. Nothing is there. It's not in the testimony. It's not in the CFRs, and we don't know what's in the grant. What we do know from the testimony of Gwendolyn Simpson, the lady that actually approves the grant, is contained on our ERJ, which is an exemplar of government Exhibits 200 through 225. And at SER 36, she says, and I quote, in answer to Mr. Weldon's question, is this the document they would use to get paid? Answer, yes. The government moves to introduce 200 through 225, and that document has no reference whatsoever to in-kind contributions. The payments are for money that has already flowed, money that is spent for things like salaries, office supplies, and so forth. And when one looks on the form, you can see that and see how Ms. Simpson has said approved. The amount she's approved is on line I on page 1. She signs this in her capacity with the Division of Grants Management for SAMHSA. If this is the document that's required to be paid under the law of this circuit, this is the document that's material for payment. The in-kind summaries are a regulatory requirement which has some source somewhere, but wherever that source is, it's not in the record before this court. And that's why this is not material. So on the grant fraud cases, first, there's the problem with Gary Conte not being involved with any false submission. Do you disagree with the government's position that the grant required in-kind contributions in order to keep the grant current or to keep the money flowing to the organization? Do you dispute that? Absolutely, Your Honor. So no in-kind contributions were required in your view? The in-kind contributions had some source of requirement. I believe it's in the statute. But in this particular grant, as far as them being a requirement for the government to pay, I certainly disagree with the government's position. So the granting element in this case didn't require any in-kind contributions. Is that your position? The record does not contain the text of the grant, Your Honor. Right, but that wasn't my question. I was just asking what your position was. The position is that it's not proven. The evidence is insufficient. And if you look carefully at the testimony of the different witnesses, none of them point you to a place in the grant that says you must have in-kind up to snuff if you're going to get paid. It's not in the record, and a thorough combing of the record won't reveal that anywhere. Can I ask about a different issue? Yes. Just that I had a particular question about, and then you could get back to that issue. On the organizer enhancement, 3B1.1, you argue that Mr. Conte was not a organizer, leader, manager, or supervisor. And the government points to evidence that Conte's counsel conceded that Conte was a supervisor for Dorothy Still Smoking.  Your Honor, to be an organizer or leader, you have to supervise someone in the legal conduct that is prohibited by the statute. I don't think there's anything in the statute. So it says that she has to be a participant, which is somebody who's criminally liable. That's with 3B1.1. So was Dorothy Still Smoking not a participant as defined in the guidelines? I don't think she's a participant in any illegal activity that Gary Conte supervised. And does 3B1.1 require that she be supervised in that illegal activity? I believe it does. The case that I've cited is United States v. Woods, and what Woods says is you have to supervise actual criminal conduct. And that's the case I've relied on, and I don't think there's anything in the record that shows Gary Conte supervised illegal conduct. So there was some—I'm sorry. I was going to say, so as I understand it, you're saying it's not enough if Conte was a supervisor of Dorothy Still Smoking in connection with the plan. He had to supervise the conduct that was criminal. Yes, Your Honor, and I disagree that he's a supervisor. As the evaluator, he's an outside consultant. I thought she was a local evaluator. They submitted—the government submitted an email that said she was on his team. Wasn't she assistant evaluator? And he was evaluator. She was an evaluator, and she, though, is not—certainly he's not supervising her in any direct activities that I'm aware of. So there was one email that were interchanged that the government submitted where he was advising her how to change a entry and said, if you're uncomfortable, don't do it. And she said, no, I'll do it. Mission accomplished, which I guess a jury could reasonably—or the government suggested a jury could reasonably believe was he was coaching her for doing—for creating a fraudulent in-kind invoice and that she agreed to do it. The issue—of course, the issue on sentencing is where—whether there is sufficient evidence, I guess, a preponderance standard for the district judge to decide that. And that's—I don't think has anything to do with the sufficiency of evidence before the jury on the conspiracy. And I'd like to, if I could, briefly address the bankruptcy fraud conviction. What the government has done in this case on the bankruptcy fraud, they have an indictment that speaks to the language of Section 157, but it charges failure to disclose to the trustee assets that the government claims should have been disclosed. And that's a bank account, the indictment goes on, in Learning Associates in a bank in Browning, Montana. First, we don't concede that there's a violation of 152 because it's a corporate bank account and a personal bankruptcy. But be that as it may, the indictment itself does not properly charge a crime. And that issue was addressed in the district court opinion. It's raised as a matter of law by Rule 29. It's addressed in the district courts opinion at page 16 and where the court considered it. It's interesting that the government's theory on the bankruptcy case keeps changing. The government's theory, quote, the fraud was the active concealment of the assets from creditors and used in the bankruptcy to further avoid paying as judgment creditors. That is a completely different theory than the government argued at the Rule 29. And when the judge said the government's evidence is related to the core of the criminal conduct charged against Conte, the conspiracy and scheme to defraud POCA. And that's the only thing that was addressed by the district court opinion. The theory now on appeal is, well, he transferred money to a couple of bank accounts, and therefore that's a scheme. That doesn't even come close to being a violation of either statute. But the point is on the challenge to the charge itself and on the challenge to the sufficiency of the evidence and whether there's a variance or not. The government charged something under 157. That's not a crime under 157. Under 157.3, the defendant must do something in relation to or concerning a bankruptcy proceeding. An example of that is where somebody says, I filed bankruptcy over here, and I don't owe you the money anymore. That's a simple example. But that's not what happened. There wasn't any proof whatsoever to back up what the government charged, a violation of 157. And instead, they came to trial with questions. And if you read the trustee's testimony carefully, the entirety of that transcript has to do with the disclosures that were made or not made at the 341 hearing. Well, the government says that at least there was at least a schedule which showed that he didn't put down the bank accounts, the other bank accounts he had, including an NAB, which would be defrauding the creditors. Did you disagree that that was in evidence? I don't disagree that that's the schedule. The schedules are all in evidence. They're in the ER. But that doesn't constitute a violation of 157. The failure to disclose is not a violation of 157. You're saying that a scheme to defraud creditors is not a 157 violation. Is that your position? No, Your Honor, absolutely not. No, a scheme to defraud creditors can be a 157 violation if the bankruptcy is used to conceal it or hide it or is an artifice to continue it. But that's not – there's no evidence like that here. All we've got here is a couple of transfers from one bank account to another, and a bank account in the name of Learning Associates, a corporation in which – and this is very important – Mr. Conte doesn't have any equity interest, doesn't have any shareholder interest. He's the president. That's it. So that's a corporation that doesn't have to be disclosed, and we've cited authority from various bankruptcy courts that say that that doesn't have to be disclosed on a personal bankruptcy petition. Counsel, I would like to ask you – this may take you a little over your time, but there was one issue raised in your briefs that you haven't touched on here. I'd like you to at least cover in a minute or two. There was one conspiracy conviction where in your briefs you argued that there was an element for a violation to show intent to deceive, and that on that general conspiracy there was no jury instruction on that. Your Honor, there – actually, there's two conspiracy convictions, one under 18 U.S.C. 371 and one under the False Claims Act. In the jury instruction, there are two clauses to 18 U.S.C. 371. One of them is the defraud clause, and that's covered by a specific jury instruction in our Ninth Circuit jury instruction book, and one is that conspiracy to defraud the government. The problem in this case with the jury instruction is the court instructed on the wrong clause of 18 U.S.C. 371. The clause that was instructed on just says an offense against the United States. That instruction has nothing – does not mention an intent to defraud. An intent to defraud is an element of 18 U.S.C. 371, and that coupled with – Could you explain why we should reverse on that conviction as a matter of plain error when there was no objection to the jury instruction? Yes, Your Honor. First, it's error. Second, it's plain from the record, and it was plain at the time of the conviction because the law was settled in the case we've cited in the brief. Why does it affect substantial rights? It affects substantial rights because it's a constitutional right to be convicted only on – to be tried and convicted only on what the grand jury found. And the grand jury indictment is for the defraud clause. And if you look in your ER, you'll see that's how it's pled in the indictment that was filed with the grand jury. And that's decided by the circuit in United States v. Caldwell. And so it affects a substantial right. And then on jury instructions in this circuit, we have adopted the Brecht standard. And under the Brecht standard, the government has to prove beyond a reasonable doubt that the substantial rights weren't affected. And the Brecht standard has not been met by the government in its brief and its arguments on this issue. So assuming that the standard is, for the moment, is prejudice, that the substantial rights goes to whether your client was prejudiced, how is your client prejudiced by the omission of the defraud clause? The government says there was no prejudice because all of the evidence in the case was about a scheme to defraud. Your Honor, the reason Gary Conte was prejudiced by this case, you know, prejudice is a conviction that comes about on an improper basis. In this case, there was a plethora of testimony about how Gary Conte violated different regulations. He violated regulations by submitting in-kind reports where he was trying to get a grant for the tribe on something else. Oh, you can't do that, the witness says, because that's against the regulations. There's a number of things that are outlined in my brief about that. And the reason he's prejudiced is because the citing saying that's against the regulations and this is against the regulations and the SAMHSA regulations is that it allows the jury to convict on something that Congress never made a crime. Congress never made it a crime to violate the SAMHSA regulations, whether they pertain to – Putting that to the side, assuming that that's not – that the jury didn't convict based on the regulations. Isn't it still your position that substantial rights are violated if the jury did not find beyond a reasonable doubt every element of this crime? Yes, Your Honor, it is. That's my position. Okay. Great. Well, you've gone over your time. I'm still going to let you have one minute for rebuttal. Thank you, Your Honor. Okay, but we'll give the government some argument, some extra time. And Mr. Rossat, we'll add whatever time you need to respond to the extra time that I've given your colleague. Good morning, Judge Gould, members of the Court. I'm happy to give Mr. Gent some of my time since I don't plan to speak for my 15 minutes. And I do appreciate that you think that you do us – that we're doing you a big favor coming from Montana, but just getting out of the smoke for a few days is helping us. Your Honors, I have my friend, Mr. Gent, at a disadvantage since I not only tried this case once, I tried it twice. So I have, in my view, a much more acute knowledge of what was proven and what was not proven. I don't know if the Court wants me to go into the materiality argument that Mr. Gent stresses. I would like to hear your thoughts on that because it seemed to me that the case was sort of thin on materiality. Actually, Judge, the whole trial was about materiality. I mean, the whole – we presented this case as one fraud that was set up into two stages, both of which were fraudulent. First, you had to lie to get the money down to Blackfeet, and then you had to make certain lies to get the money from Blackfeet into the pockets of the conspirators. Now, Ms. Simpson, in the record, and I apologize to the Court, I printed off the transcript from the trial transcript, not from the SER, but it's in the SER. Have you had experience with tribes and these kinds of grants that have difficulty making their in-kind contribution? All the time, yes. Okay, tell us how that goes. What happens to the money for them? Well, the money, it's actually the grant is terminated. If the organization is not able to meet the match, the grant is terminated. Because the match requirement is part of the statute, it's the law. They must do that. And so if they tell us they can't do it, we terminate the grant. So I don't know how it could be more material that the in-kind representations were directly linked to continuing the money from the very beginning. You'll see in the testimony of Mr. Spears how he describes the funding arc in the SAMHSA grants that says, at the beginning of the grant, the in-kind or matching contribution does not have to be terribly large, $3 of federal money for every dollar of in-kind or matching funds. And then as the grant progresses, there is more of a demand on the grantee to come up with their investment, and by their investment I'm describing in-kind or matching funds, so that by the end of the grant, when the grant is terminated, ideally the organization, in this case the Blackfeet Tribe, has a stand-up project that they can fund themselves because they've been weaned off federal money by continuing to put in in-kind or matching contributions generated by themselves. So it was extremely critical that they provide in-kind and matching funds or in-kind services to show the government that this, at the end of the POCA grant, was going to be something the Tribe could take over and continue to do without federal funding. How do you answer Mr. Gent's argument that the record does not show that the in-kind contributions were needed to get the grant or to continue the funding? Right from the testimony I just gave you, Judge, that says it's part of the law. They have to have in-kind or matching or the grant is terminated. Ms. Simpson was clear. Where in the record? Again, it was Ms. Simpson's testimony. I only have the trial transcript, but at that transcript it's page 57. I'm sure it's in my S.E.R. It's very helpful. Thank you. One of the points I was hoping you would address was this statutory conspiracy. Is it 371? I might have the numbers wrong, but the conspiracy theory on which there was conviction, but no instruction that intent to deceive was a required element. Yes, Your Honor. How do you respond to that? Interestingly enough, there is an intent to deceive element of both prongs of 371. The 371 statute says anyone who conspires to defraud the United States or to violate a law of the United States, and that's where the two prongs come in. And we had charged this case because we wanted to include the Blackfeet tribe as a victim under 1341, the wire fraud statute, rather than just under 371, conspiracy to defraud the government. So we made the choice to include 1341, and what happened was because this Court has the standard instructions for conspiracy to defraud the government, it escaped my notice, and it is an incorrect instruction under the circumstances of this case, and it escaped both the Court and defense counsels. Given that, then, why shouldn't that? I realize you don't agree on the other arguments, but why shouldn't that conviction on that one count be vacated, and then, I guess, assuming we affirmed on the other counts, it would be up to the Court whether that made a difference. You could, Your Honor. I think under the unique circumstances of this case, it's uniquely unprejudicial because of the fact that the government, again, is the target of the fraud, whether it's under the first prong or the second prong. Both are a conspiracy to defraud the government. It's just I used the 1341 statute of wire fraud, which should have then kicked in the second prong that described that statute rather than a scheme to defraud the government. So walk me through it. So 371, the jury instruction just said that there was an agreement to commit one crime as charged in the indictment.  by obstructing the lawful functions of the government by disequal or dishonest means. So walk me through why that jury instruction, which doesn't require a finding of disequal or dishonest means, didn't prejudice Mr. Conte. I would argue, Your Honor, because the fact that they found guilt on all the counts of wire fraud, which does include an intent to deceive, that it's clearly not prejudicial that it was out of that one conspiracy charge. Any case authority that says that if a jury isn't asked to give a verdict on all essential elements of a claim, that the court could still affirm a conviction on that count because there's other evidence that would have led to that? No, Your Honor. I don't have a case exactly on point. Only the harmless error analysis. But then that case of ours, forget the name of it. Maybe it's called. We had a case that said that failure to instruct on an element was not harmless error. Yes, Your Honor. That's correct. Did that come before Nader? I thought in the Supreme Court's Nader that failure to instruct on an element could be harmless. I think in Nader it was a jurisdictional issue, though, not the key issue is here. Yes, Your Honor. I believe your case law does predate that Supreme Court one, but I don't know that we've addressed that in our brief. But I do believe that's true. If the court has no other issues that you'd like me to address. Could you address the 3B1.1 and why it is that he was supervising a participant? Yes, Your Honor. And that actually is an easier one for me because we think that Gary Condie wasn't just supervising Dorothy Stillsmoking in the chain of command of the grant, which he was, that he also had de facto organizational and leadership of almost everybody that was otherwise invited. I thought he was acting as a consultant. He was giving advice. He responded to questions about what's the best way to do things. But we've said that's not enough. There has to be some indication that he was in charge or that he was bringing the conspiracy together and causing it to happen. So I didn't see, the only thing I saw which said he was in charge or giving someone orders was his interaction with Ms. Stillsmoking. Actually, that would not be correct, Your Honor. If we look at the testimony of both Ms. Onstead and Ms. Sherman during the trial, and even there was another woman that testified named Charlotte Newbrest, all of those witnesses talked about the triumvirate of authority in the POCA grant program, which was Onstead, Augere, and Condie, that they met together, that this was their deal. And they would describe Mr. Condie as the person they would call whenever they had a problem or needed some advice on how to deal with the in-kind issue. I saw that. I mean, that was advice is not giving direction. I mean, we've said that there has to be some evidence that defendant exercised control. Yes. And we said that even if the defendant had an important role that made him integral to the success of the criminal enterprise, or even that it gives him a high degree of culpability, that's not enough. So in that case, it was a translator for the co-conspirators. So we need to find something that shows that he was actually in control, that he was a decision-maker, or that he was directing people's actions. Well, and I think you have him directing people's actions in those e-mails, Your Honor. I think you see him saying, here's how you're going to up your in-kind. You're going to claim $1,000 a month for use of the old folks' home, even though you knew that they didn't use the old folks' center or the senior center for anything to do with POCA. You see him in those e-mails talking about how to craft things in terms of units so that you don't have to put down hours because then you can get it by the auditors. He's giving all sorts of advice. He's giving advice. Was he giving orders? How do I know those are orders? With respect, Your Honor, I don't know. I think that was for Judge Morris to decide and to defer. And I think even under what was presented to the jury for sufficiency of the evidence arguments, I mean, that appeared to everybody else to be giving orders, whether by virtue of the fact that he had a Ph.D., whether by virtue of the fact of his close connection with Onstead and Augere, whatever linkage was there, the jury found it, the court found it, that he's giving orders. He's directing how this thing is going to be. Number one, you're going to get all the in-kind representations made so that you get all the money that you're going to get out of the POCA grant. And two, when the auditors come, how we're going to get out from under audit inquiries so that we get money in the future, which it was our theory of the case that that was always his intention, that this was his retirement plan, for him to continue to be a grant, have a role in the grants at Blackfeet over the years so that he could continue to make money. So continuing a relationship with the government that doesn't put them at high risk or that doesn't give them any sort of a label as being fraudsters would be important. That's one of the reasons that, and again, there's the clawback provision that we described in our brief, which is both regulatory and there was also some testimony to that effect, that if the audit shows that they've been deceived, that the government's been deceived, they can send a bill to the Blackfeet tribe and claw it back. Thank you, Your Honors. I appreciate it. I've been doing this for 30-some years, and it's always a pleasure to come out and visit you folks. So, Russ, we appreciate it. Thank you, sir. We appreciate your argument. Mr. Kent, we're going to give you one minute rebuttal. And for my first 10 seconds, I'd like to ask the Court to look at the other fair trial issue, and that is on the evidence of Mr. Conte, Dr. Conte's bankruptcy, and ask this one question. Why did the government need that to prove their case? And if they didn't need to do that to prove their case, you'll see I've cited a Law Review article on stigma and bankruptcy. What good could that have done other than prejudice the appellant, Dr. Conte, in his credibility before the jury? To respond to Mr. Rosted's statement that at some other time, at some other grant somewhere, if we would have terminated a grant if in-kind wasn't up to snuff in this particular grant, they didn't get anything for two years. And we still don't have anything in writing anywhere, and we don't have this grant in writing that says if you don't keep your in-kind up to date, we will terminate it. What about the testimony that he referred to? The testimony? Not in writing, but it's testimony of someone involved. And that person involved is a mere human being, and the record is totally unclear and totally vacant of any authority that he had to be the person to terminate a grant. In fact, we've cited the CFRs in our opening brief that talks about how a grant can be terminated. The first thing you have to do is look at the terms of the grant. The government has cited CFRs saying, well, they would have had, from testimony, they would have had issues on the back end of the grant. And you know what those CFRs say? It's very interesting that the government would cite it. And when you look at that particular regulation, it refers to, and I'll find it here, because that's very important. Well, we're well over time, so keep it brief. Okay. I will keep it brief. Essentially, the SCR 656, what it says is that that's that regulation. And it says we can recoup cost expended under the grant. And cost expended is what they're actual paid out if those costs are violations of the terms of the grant. Where are the terms of the grant? I appreciate the argument. I think we will thank Mr. Gent and Mr. Rostad. Both made fine arguments in addition to traveling far and getting away from the smoke. We have our share of smoke this year, too. Let me thank you both. The Conte case, US v. Conte, shall be submitted. And I think we're done for the day. Thank you. Thank you.
judges: Goodwin, Gould, Ikuta